**UNITED STATES v. NORTHWEST AIRLINES, Inc.**

**Civil Action No. 1019.**

District Court, D. Minnesota, Third Division.

July 26, 1946.

NORDBYE, District Judge.

Victor E. Anderson, U.S. Atty., and John W. Graff, Asst. U. S. Atty., both of St. Paul, Minn., for plaintiff.

Pierce Butler, Jr., and Irving Clark (of Doherty, Rumble, Butler, Sullivan & Mitchell), all of St. Paul, Minn., for defendant.

The matter involves a proceeding to collect a $1,000 civil penalty from the Airlines Company for its alleged violation of the Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq., and certain Civil Air Regulations issued pursuant thereto.

The Government's testimony indicates the following facts: One H. F. Tanke is a senior air carrier inspector of the Administrator of Civil Aeronautics and is attached to the radio division. There are three inspection divisions under the Administrator, to wit, operations, maintenance, and radio. Tanke came to Minneapolis in pursuance of his official business on the evening of August 15, 1944. He was at the Wold Chamberlain Field on August 16 and 17. He finished his business on August 17, and some time in the early afternoon went to the ticket window of the Northwest Airlines and asked the person there to have a jump seat installed in the pilots' compartment on Flight 12, in that he desired to make an inspection on that trip which goes from Minneapolis to Chicago. According to Tanke, the man to whom he spoke communicated with someone else in the Northwest Airlines office, and Tanke was informed that his application was denied because the inspection was not to be made by an operations inspector. He then contends that he asked for space on that flight and was told that the passenger list was filled, but in the event there were cancellations he might find space. Some appreciable time before the flight left at 6:35 P.M., he filled out the form used by inspectors for the purpose of requesting access to aircraft. This form is in evidence as Government's Exhibit 2, and reads as follows:

"Department of Commerce Civil Aeronautics Administration "Washington

Triplicate (To Chief, Air Carrier Division, Washington)

"Air Carrier Inspector's Request for Access to Aircraft

"The undersigned, for the purpose of performing his official duties during the flight of aircraft operated by Northwest Airlines from Minneapolis, Minn., to Chicago, Ill., hereby requests access to such aircraft leaving the above-named point of departure at 6:35 P.M., 8–17–1944. This request is submitted on a space available basis."

This request was signed "Harold F. Tanke, Air Carrier Inspector (Radio)." It may be noted that it was submitted on a "space available basis." There are two forms of request—one called "space available" and the other "must ride." If there is a "must ride" request, the inspector has top priority, and either a passenger or baggage, or both, will have to be removed in order to make room for him. This, however, was a "space available" request, as stated. There was a cancellation and he obtained space on the plane in compliance with his request.

He boarded the plane, sat where the passengers ride, and in a passenger's seat. He then contends that he presented his credentials to the stewardess and requested that she ask the captain for permission to enter the pilots' compartment for the purpose of making an inspection in his capacity as a radio inspector. She went to the captain, Captain Kruse, and made the request, and then she informed Tanke that the request had to be refused because there was no jump seat available on the airplane. Tanke then states that he got off at Milwaukee because the space available from there to Chicago was all taken; that he saw Captain Kruse at the Milwaukee Airport and the latter informed him that he was sorry that he had to refuse the request, but that due to a company regulation it was mandatory on him to refuse because no jump seat was available.

There is a conflict in the testimony in that the defendant, through Milton Anderson, who is assistant to the Superintendent of Operations, and Anton Arndt, in charge of loading on the Northwest Airlines, tell a different story from that which was related to Tanke. Arndt states that he was the man Tanke asked for a jump seat. He contends, however, that, instead of the incident taking place on August 17, it was August 16, and that he took the matter up with Anderson and thereafter he told Tanke that the gross weight of the passengers and cargo on the flight which left that afternoon at about five o'clock, which was the leaving time for Chicago, and the plane which he contends Tanke desired to board for inspection purposes, was filled to capacity so that the gross weight had reached its maximum and no other passenger could be admitted. Arndt states he told Tanke to try a later flight, and probably he could get Tanke on that. But he contends that Tanke did not show up for any later flight, and, according to both Anderson and Arndt, that was the only request that was made by Tanke for a jump seat in connection with a proposed inspection. They deny that Tanke was informed that the jump seat would not be installed because of the fact that he was not an operations inspector.

Both Captain Kruse and the stewardess, Corrine Juelson, remember the incident on the flight when Tanke asked for permission to enter the pilots' compartment. Miss Juelson states she knew who he was, and while she does not remember having any credentials presented to her, she recognized him and told Captain Kruse that Tanke had asked permission to enter the pilots' compartment for the purpose of inspection. Kruse admits he refused, and states that he did so because it would be a violation of the regulations promulgated by the Northwest Airlines, which was to the effect that no one could enter the pilots' compartment unless a jump seat was available, and that was the basis for his refusal. Kruse's testimony, however, differs from Tanke's, in that he contends the request was made after the plane had left Madison, Wisconsin. He states that the flight from Madison to Milwaukee would only occupy about thirty-five minutes, and that with the time involved in the takeoff and landing, it would be very inconvenient to admit an inspector into the cockpit when there would be such a short time when the plane would be actually cruising. But Kruse did state that, if an inspector had been standing in the pilots' compartment, it would not have bothered him any more than if he was sitting there.

There is this dispute between the evidence given by Tanke and that given by Anderson and Arndt. I think that the representatives of the Northwest Airlines are mistaken when they state that Tanke made the request on August 16 for the five o'clock flight to Chicago. Government's Exhibit 2, the request for access to aircraft, is dated August 17, and I believe it is the only request that Tanke made. My analysis of the testimony is about as follows: Tanke came to the ticket window on August 17 during the afternoon and asked for the installation of a jump seat. He stated that he wanted to board the Chicago plane leaving at 6:35 P.M., and make an inspection in his capacity as a radio inspector. He contends that his request was refused because he was not an operations inspector. Tanke may be mistaken about the reasons that were assigned for the refusal. His request may first have been refused because the plane was already loaded to gross capacity. But, whatever reason the Airlines Company gave for its refusal, the company was informed

that Tanke wanted to make an inspection on that Chicago trip. And when it granted the request for access to aircraft in the form of Government's Exhibit 2, then it was aware that Tanke intended to make the trip in an official capacity. If it considered that it was necessary or desirable to have a jump seat in the pilots' compartment in order to have an inspector present in that compartment, it was notified by all of these facts and circumstances in sufficient time of Tanke's inspection trip so as to permit it to install a jump seat.

But I am of the opinion that the installation of a jump seat is not a condition precedent to the right of a government inspector to enter a pilots' compartment, and this conclusion is arrived at by a construction of the regulations promulgated by the Civil Aeronautics Board. These regulations take precedence over any regulations that the aircraft company may have issued, and my view is that there was a conflict between the Airlines' regulations and the Civil Aeronautics regulations, and that the latter must prevail. These regulations will be found in the printed copy of the Civil Air Regulations, and on page 20 thereof appears Section 61.7803 entitled "Pilots' compartment." It may be urged that there is some indefiniteness in the portion of the regulation which pertains to the presence of a jump seat in the pilots' compartment and its applicability to government inspectors, but a reasonable construction thereof and giving due effect to the subsequent provisions should dispel any doubt as to the intent in that regard. The following regulations should be considered:

"61.7803 Pilots' compartment. (a) No person except a member of the operating crew or an air carrier inspector of the Administrator of Civil Aeronautics shall be admitted to the pilots' compartment during such flight unless his admission is approved by the first pilot and such person is one of the following: (1) An employee of the Federal Government or of an air carrier or other aeronautical enterprise, whose duties are such that his presence in the cockpit is necessary or advantageous to the conduct of safe air carrier operations or the im-

provement of the safety of such operations;* (2) a person whose presence in such compartment has been specifically authorized by the management of the air carrier operating the aircraft and by the Administrator.

"(b) No person shall occupy a seat in the pilots' compartment or the companionway thereto unless such seat is securely attached to the structure of the aircraft and is provided with a safety belt which shall be kept fastened by the occupant throughout his occupancy of such seat.

"(c) Unless a seat is also available for his use in the passenger compartment, no person shall be admitted to the pilots' compartment during scheduled flight except: * * * ."

Included in the exceptions in Section (c), however, is the following:

"(2) A person engaged during flight in checking of pilots' operations for the Federal Government or for the air carrier."

After the exceptions are noted, there follows this separate paragraph:

"(d) Any air carrier inspector of the Administrator of Civil Aeronautics shall be admitted to the pilots' compartment of an air carrier aircraft at any time while in the performance of his official duty."

The defendant seeks to interpret these regulations to the effect that, in absence of a jump seat in the pilots' compartment, no government inspector can be admitted there. But, of course, the regulations do not state that everyone in the pilots' compartment must occupy a seat. They merely state that no person except a member of the crew and an aircraft inspector shall be admitted to the pilots' compartment without the approval of the first pilot and that no one shall occupy a seat in the pilots' compartment unless the seat is attached to the aircraft structure and is provided with a safety belt, which shall be fastened by the occupant during the occupancy of such seat. It presupposes the availability of a seat for that class of occupants of the pilots' compartment. But it would appear that government aircraft

* (The note referred to is omitted in that it has no bearing on the question being considered).

inspectors do not come within the classification to which that restriction pertains. My view is that Section (b) does not qualify or limit Section (d). An air carrier inspector of the Government under Section (d) is given the absolute right at any time in the performance of his duty to enter the pilots' compartment. This right is in no way qualified, and in view of the purpose of the regulations in providing government inspection of aircraft, must be unrestricted. Indeed, there may be occasions when it would be very inconvenient, if not impossible, for an inspector to remain seated all the time in the pilots' compartment with a safety belt around him when he is required to make an inspection. For instance, Section 61.7810 of the Civil Air Regulations provides that the pilot of an aircraft must see to it that two satisfactory flashlights in good working order are provided in the aircraft and are accessible to both pilots. Section 61.7804 requires that a radio telephone headset shall be worn by the first or second pilot. If an operations inspector, for instance, wanted to check on the observance of the rule pertaining to flashlights or a radio inspector desired to check as to the telephone headsets, the presence of a jump seat in the pilots' compartment would not be needed for such purpose. In other words, all an inspector would do under such circumstances would be to enter the pilots' compartment during flight and state to the pilot in command the purpose of his inspection. and upon being satisfied that that provision of the regulation was being complied with, he might retire. This merely illustrates the unsoundness of the defendant's position that the presence of a jump seat should be mandatory before an inspector can even enter the pilots' compartment. Undoubtedly, there are many other types of inspection which would be unduly curtailed and impossible to perform if defendant's interpretation is adopted. True, upon descending or ascending, it might be unwise for an inspector to be in the pilots' compartment unless he were seated in a jump seat. But Tanke did not endeavor to enter the pilots' compartment during the ascent or the descent. The aircraft was cruising at the time.

There may be times when it would be highly imprudent for an inspector to make an official inspection and stand in a pilots' compartment when there was bad weather or poor flying conditions, or other circumstances that required the captain and his co-pilot to exercise the utmost care, unhampered by any distraction during the flight. But, of course, under these circumstances, whether the inspector was in a jump seat or standing up, an inspection might be unreasonable. It is not necessary, however, under the facts herein to determine whether a refusal under such circumstances would constitute a violation of the regulations.

Undoubtedly the framers of the regulations assumed that the inspectors would exercise common sense and due prudence in intruding themselves upon the captain and his co-pilot in making an inspection, and in that they are skilled in the field in which they are trained as inspectors, they are supposed to understand the problems of the captain and his co-pilot in operating an aircraft and make their inspections at such times and under such circumstances as will not interfere with or endanger the navigation of the aircraft. But it is not reasonable to suppose that the regulations intended that the inspector's right to come into the pilots' compartment was dependent upon the captain's discretion or sufferance, or upon the availability of a jump seat, or that if there was a jump seat installed the inspector must be fastened therein during the entire trip. In fact, the regulation specifically exempts an inspector from the ones who can be admitted only with the consent of the first pilot.

Captain Kruse did not deny Tanke's request because the time was inopportune for the making of an inspection or that he was confronted with adverse flying conditions or any other situation which might make it inadvisable or dangerous for anyone to be in the pilots' compartment. He merely denied Tanke admission to the pilots' compartment because there was no jump seat there, and the regulations promulgated by the aircraft company, as found in the stipulation which the parties have entered into, make it mandatory on the cap-

tain to refuse access to the pilots' compartment to everyone unless there is a jump seat available. This regulation of the defendant company conflicts with the absolute right granted by the Civil Air Regulations to the inspector to enter the pilots' compartment at any time. Therefore, I am quite clear that the Government must prevail in this suit because I think Tanke made a timely request for a jump seat, if such request is a condition precedent to his right to enter the pilots' compartment, and upon defendant's neglect to provide such a jump seat, and upon its refusal to admit him under such circumstances to the pilots' compartment, it has violated the regulations and is subject to the penalty which the Act provides. Moreover, if he never made a formal request for a jump seat, under the circumstances as disclosed by the evidence here, his request to enter the pilots' compartment was reasonable, and Captain Kruse violated the regulations in refusing him access.

█ Reference may be made to Government's Exhibit 6, which is the official report Tanke made to the Chief of the Air Carrier Branch, Third Region, on August 18, 1944, which was the day after the incident regarding which Tanke testified. Defendant objects to the admission of the report as self-serving. It appears that Tanke did not need the memorandum in order to refresh his recollection, in that he had an independent recollection of the date and the circumstances covered by the report. It may well be that an ordinary memorandum under such circumstances is not admissible in evidence. But this is not an ordinary memorandum. It is an official report made by an employee of the United States in the performance of his duty, and the record is one of the official files and records of the United States Government. Moreover, there is a sharp conflict in the testimony as to when Tanke made his request for the jump seat. This report, made the day after the flight took place, indicates that Tanke requested a jump seat of the Northwest Airlines' personnel at approximately 4:45 P. M., August 17, 1944,

for the 6:35 P. M. flight. The defendant's witnesses challenge Tanke's statement in this regard and contend that the only request Tanke made for the jump seat was on August 16, 1944, and for the 5:00 P. M. flight rather than the 6:35 P. M. flight. Tanke's report was made when he could not have known that there would be any dispute as to what took place at the Airport, nor did he know that any litigation would ever ensue from the circumstances covered by his report. Under these circumstances, therefore, there is an exception to the general rule regarding the admission of reports or memorandums made contemporaneously with the events, and the document is admissible as original evidence. Sullivan v. Minneapolis Street Railway Co., 161 Minn. 45, 220 N.W. 922. However, without the exhibit in evidence, the Court would arrive at the same findings as reflected herein.

█ This brings me to the amount of the penalty which should be assessed. The good faith of the defendant is not questioned. The company has been cooperative and apparently there has arisen a bona fide difference as to the correct interpretation of the regulations. The circumstances, therefore, do not suggest the assessment of the maximum penalty, or any sum approximating that amount. But the violation cannot be termed trivial, or be disposed of by a mere nominal penalty. Considerable correspondence took place between the parties after the events of August 17, 1944, and before this suit was instituted, and even after the defendant was fully informed of the Government's position and the violation herein, it refused to change its regulations which conflicted with the Civil Air Regulations. After due consideration, therefore, the Court concludes that the sum of $350 should be assessed as a civil penalty for the violation herein, together with plaintiff's costs and disbursements.

Appropriate findings of fact and conclusions of law consistent herewith may be presented by the plaintiff.

An exception is allowed to the defendant.